**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 18-20482-CR-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

v.

RAYMOND BROWN,

       Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS**

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence and Statements [D.E. 21], filed on September 11, 2018, to which the government responded in opposition. [D.E. 27]. An evidentiary hearing on the motion was conducted on October 4, 2018. Based on our review of the record, and consistent with the following findings of fact and conclusions of law, we find that the motion should be DENIED.

### *I.     RELEVANT FINDINGS OF FACT*

Raymond Brown (hereinafter "the Defendant") is charged by indictment with Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (Count 1), Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) (Count 2), and Possession of a Firearm and

Ammunition by a Convicted Felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).

During the month of March 2018, law enforcement received several anonymous communications from persons advising that the Defendant was selling narcotics out of his residence located at 3677 NW 213 Terrace, in Miami Gardens. The record shows that this residence is located within an area of the City that is known for significant gang and drug activity. Law enforcement already knew, for instance, that the Defendant who resided at this address was a documented gang member in Miami Gardens, a convicted felon, and a known drug dealer. Significantly, the Defendant was shot multiple times in his leg right in front of his residence. As a result, law enforcement was concerned that the Defendant would retaliate against the person that shot him. And based on the record presented the Court finds that law enforcement had a substantial factual basis to regard the area surrounding Defendant's residence as a high crime area.

Based upon all this information, on March 13, 2018, law enforcement conducted surveillance at the Defendant's residence, in an effort to observe any criminal activity. Multiple officers and vehicles were used during the surveillance, which began in the morning and continued throughout much of the day. During the surveillance, law enforcement observed the Defendant enter and exit his residence multiple times. While the Defendant was outside, law enforcement observed the Defendant engaging with several passersby, conducting what appeared to be hand-to-hand drug transactions.

During the first incident, law enforcement observed an older female, later identified as Ms. Mingo, walk towards Defendant's residence. Shortly thereafter, the Defendant was observed as he stood in front of his residence and met with her, in a manner that law enforcement believed evidenced a hand-to-hand transaction involving narcotics. After the brief encounter, the female walked away.

A short time and a few blocks later, Ms. Mingo was stopped by some of the officers and questioned at the scene. She indicated that she purchased a $30 "baggie" of powder cocaine from the Defendant, whom she knew to be called "Jay Leno." Law enforcement knew that Defendant was known in the neighborhood as "Jay Leno." Ms. Mingo then produced a green baggie containing powder cocaine from her purse and handed it to law enforcement. She was placed under arrest and charged with possession of cocaine. The powder substance was field-tested positive for powder cocaine.

During a second suspicious encounter, law enforcement observed a male drive in front of the Defendant's residence, exit his car, and approach the Defendant. Shortly thereafter, law enforcement observed the Defendant as he conducted what appeared to be a hand-to-hand transaction with in a manner consistent with narcotics sales. After the man left the Defendant's residence, he too was stopped and questioned by law enforcement. He denied engaging in a narcotics transaction but claimed that he went to the Defendant's residence to place bets on illegal gambling.

The surveillance continued, now well into the afternoon. At that point law enforcement observed another male, later identified as Peter Francis, drive up in front of the Defendant's residence, exit his car, and approach the Defendant. Shortly thereafter, law enforcement observed the Defendant as he conducted what appeared to be another hand-to-hand transaction with Mr. Francis. Mr. Francis was known to law enforcement from multiple earlier narcotics investigations. After he was seen leaving the Defendant's residence, he too was later stopped and questioned by law enforcement, at which point he claimed that he went to the Defendant's location to sell cigarettes to the Defendant. He claimed that he also attempted to purchase some powder cocaine from the Defendant on credit, but the Defendant declined to sell him the powder cocaine without immediate payment.

Law enforcement continued to monitor the Defendant as he stood in front of his residence. While doing so, they observed the Defendant repeatedly adjust the front part of his basketball shorts while grabbing some object (consistent with a firearm) in his waistband. They also observed him entering and exiting his residence, as well as walking around and to the side of the residence, in a suspicious manner.

After much time elapsed, and based on Defendant's suspicious behavior and the confirmation of at least one narcotics sale, law enforcement decided to arrest the Defendant. After the takedown order was communicated, multiple law enforcement vehicles pulled up to the Defendant's residence with their car lights engaged. The officers approached the Defendant with police badges visibly displayed and directed

him to stop. Defendant immediately grabbed his waistband, turned away from the officers, ran inside the residence, and closed the door.

As the officers began approaching the door, an older female, later determined to be the Defendant's mother, opened the door. Law enforcement, in hot pursuit of the fleeing Defendant, decided to enter the residence. As they made their way inside the residence, one of the first officers at the door, Officer Alejandro Gomez, could see inside and observed the Defendant coming from a back hallway and room that was later determined to be the bathroom. After the officer directed him to show his hands, the Defendant, with his hands raised, stepped back to the living room area and proceeded to lay down on the floor. At that point, officers entered and placed the Defendant under arrest in the living room area.

Immediately after the Defendant's arrest, law enforcement conducted a protective sweep of the residence led by Officer Gomez. Officer Gomez entered the hallway area where several rooms and doors were. He entered one bedroom where he found two males inside. The males were later determined to be the Defendant's father and brother. They were removed from that area. Other officers later entered the bathroom area where the Defendant had just exited. While in the bathroom during the protective sweep, Officer Onassis Perdomo (still armed in his right hand) moved the shower curtain to the side and observed the toilet lid lying on the floor of the bathtub. That led him to look, in plain view, towards the unlidded toilet tank to his left, where he could see the outline of firearm on the bottom of the tank in the water.

After the protective sweep, in addition to the firearm observed in the toilet tank, they also observed, in plain view, one small zip lock bag containing powder cocaine reside lying on the living room table. At that point, Officer Perdomo decided to search the residence in full and obtain a search warrant for that purpose. The house was seized and work began on preparing the application for a state search warrant. The application relied on the surveillance, the bag of cocaine powder residue, and the firearm. Later that evening, a state court judge executed the search warrant.

During the execution of the search warrant, the following items were recovered from the residence: (a) two zip lock bags with powder cocaine residue found in the living room area, (b) several documents with the Defendant's name and date of birth found in the living room area, (c) three (3) MDMA pills found in the bathroom vanity, (d) one (1) Beretta PX4 Storm .40 caliber Smith and Wesson (serial number PY62543), loaded with seven (7) rounds found inside the bathroom toilet tank, (e) one (1) metal box with multiple empty green/white zip lock bag found on a kitchen sink, and (f) one digital scale found under the kitchen sink.

## II.   ARGUMENT

In his Motion, the Defendant seeks to suppress all physical evidence seized from his residence, as well as his incriminatory statements to law enforcement that flowed from the search of his residence, claiming that law enforcement lacked exigent circumstance to enter his residence and place him under arrest. He further argued that, since the Defendant was found in the living room, law enforcement had no basis to conduct a protective sweep that included other rooms, including the

bathroom of the apartment. Finally, the Defendant argues that the search warrant obtained by the government was tainted because the issuance of the search warrant was based solely on observations made during an illegal entry, and that the evidence derived from the illegal entry affected the judge's decision to issue the warrant.

After the evidentiary hearing, Defendant's argument focused on the purportedly unlawful protective sweep. Defendant stepped back from the argument that no exigent circumstances ever existed to enter the residence in the first place. But Defendant maintains that at least the firearm retrieved from the toilet tank was unlawfully seized before the warrant was obtained. And no independent source exists to sustain the search because the Officer conceded at the hearing that he had not intended to search the house until after finding the firearm.

### A.   *The Initial Entry Was Lawful*

We agree with Defendant's position at the hearing that assumes for purposes of his motion that the initial warrantless entry by law enforcement into his residence was justified by probable cause and exigent circumstances. *See Payton v. New York,* 445 U.S. 590 (1980) (warrantless arrest in a suspect's home is permissible if probable cause and exigent circumstances are present); *Kentucky v. King,* 563 U.S. 452, 452 (2011) (police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect).

Here probable cause existed to arrest Defendant based on law enforcement witnessing at least one hand-to-hand narcotics transaction, confirmed after the

buyer confessed to the purchase. When executing the arrest in a high crime area, Defendant turned and retreated into his home when he saw officers approaching. The "exigent circumstances" exception to the warrant requirement applies in that situation: "The exception encompasses several common situations where resort to a magistrate for a search warrant is not feasible or advisable, including: danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway,* 290 F.3d 1331, 1334–35 (11th Cir. 2002) (collecting cases).

      Here, armed with probable cause for an arrest, law enforcement had reason to believe that they were pursuing a fleeing felon who may have been in unlawful possession of narcotics and a firearm at the time of the entry into the Defendant's residence. A reasonable police officer could also reasonably believe that the Defendant fled into his residence to destroy or hide narcotics or a firearm, or to flee from arrest. *See United States v. Maxi,* 886 F.3d 1318, 1329 (11th Cir. 2018) ("Mr. Maxi's warrantless arrest was supported by both probable cause and exigent circumstances. Detective Ogden could see a substantial quantity of drugs behind Mr. Maxi when Maxi opened the door, and Ogden had received a tip that several guns were also located somewhere in the unit. There was a risk that the evidence he saw would be destroyed if the police left the duplex to get an arrest warrant. And because the officers could not see inside the unit's other room, they did not know whether other people were in the unit.").

At the very least, officers had reasonable suspicion to approach the Defendant to confirm their suspicions. When Defendant, in a high crime area, turned and fled into his residence, that reasonable suspicion morphed into probable cause to seize and arrest the Defendant. *See, e.g., United States v. Williams,* 541 F.3d 1087, 1089 (11th Cir. 2008) (explaining probative value of flight as evidence of consciousness of guilt); *United States v. Akinlade,* 519 F. App'x 529, 534 (11th Cir. 2013) (officers had reasonable suspicion to detain and defendant's flight gave rise to probable cause to arrest for obstruction); *United States v. Foskey,* 455 F. App'x 884, 888 (11th Cir. 2012) (suspect's flight gave rise to reasonable suspicion to seize as well as probable cause to arrest) (citing *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000)).

Therefore, law enforcement's warrantless entry into the Defendant's residence was lawful as they were armed with probable cause and in hot pursuit of a fleeing suspect.

### B. *The Protective Sweep was Lawful*

Law enforcement's protective sweep of the Defendant's residence was lawful. "A protective sweep is a quick and limited search of premises, incident to an arrest, and conducted to protect the safety of police officers or others." *United States v. Delancy,* 502 F.3d 1297, 1307 (11th Cir. 2007). Protective sweeps conducted without a search warrant are lawful where the arresting officer reasonably suspects that the area to be swept harbors an individual posing a danger to those at the arrest scene. *United States v. Scott,* 517 F. App'x 647, 648 (11th Cir. 2013) (quoting

*Maryland v. Buie,* 494 U.S. 325, 334 (1990)). The Supreme Court has recognized that "the risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." *Buie,* 494 U.S. at 334. So "arresting officers are permitted… to take reasonable steps to ensure their safety *after*, and while making, the arrest." *Id.* (emphasis added); *see, e.g., United States v. Hromada,* 49 F.3d 685, 690 (11th Cir. 1995) ("Officers have a legitimate interest 'in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.' " (quoting *Buie,* 494 U.S. at 333)).

A lawful protective sweep must undoubtedly be brief. *United States v. Yeary,* 740 F.3d 569, 579 (11th Cir. 2014) ("Such a sweep must be brief and limited to areas from which an attack could be launched."). But there is no magical formula to gauge how long the sweep can reasonably last. The Supreme Court's guidance on that question makes clear only that it should be reasonable as necessary to ensure the officers' safety in clearing an area of any threat: "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie,* 494 U.S. at 335–36.

Applying this principle, the Eleventh Circuit has recognized that the sweep must be brief and not be unnecessarily extended. So, even if a sweep lasts three or four minutes, and involves multiple officers, the constitutional line has not been

crossed into a full-blown warrantless search. *See United States v. Lesane,* 685 F. App'x 705, 722 (11th Cir. 2017) ("There is nothing in the record indicating that officers either searched an area that could not harbor an individual or needlessly extended the search's duration. In particular, one officer testified that the sweep took no longer than three or four minutes, lending support to the conclusion that the sweep was cursory in nature.") (affirming denial of motion to suppress based in part on argument protective sweep was unlawful).

We are faced with largely the same facts in this record. The Court finds, based on the testimony presented at the hearing, that the sweep was not unreasonably extended and lasted only as long as necessary to arrest the defendant and clear the scene. Defendant makes much of the fact that Officer Perdomo concedes that he was the last one in the residence when the arrest was made. Indeed that is what happened here because other officers, starting with Officer Gomez, reached the residence faster based on their respective surveillance locations. But Officer Gomez conceded that he was not the one who cleared the bathroom area; others did that. And Officer Perdomo testified credibly that he was one of the officers who was conducting the sweep very shortly after entry was first made.

There simply is no basis in the record to find that the sweep lasted beyond the three or four minutes at issue in *Lesane*, for instance. Nor is there any basis to find that the sweep had fully ended *before* Officer Perdomo entered the residence and conducted his sweep. To the contrary, the record shows that as the lead officer

that day, and based on his nearby location, Officer Perdomo got to the house seconds after Officer Gomez. And when he was conducting his sweep of the bathroom, still armed, Officer Perdomo credibly testified that he was completing the sweep of the house initiated by the other officers.

In short, the sweep here was indeed brief and extended to areas of the house where persons may have been present. Specifically, the officer's movement of the shower curtain to see the tub certainly fell within the scope of a lawful sweep. And his immediate, plain view observations of both the toilet lid in the bathtub and the unlidded toilet tank next to it did not unreasonably extend the scope of a valid sweep. Having seen what was in the unlidded tank, the Officer did what he was supposed to do: he completed the arrest of the defendant, the removal of the persons in the house, and secured the area in time for a neutral judge to issue a search warrant based on what was known to the officers at the time. There is nothing unlawful about how that process evolved.

Our conclusion is further supported by *United States v. Hromada,* where the Eleventh Circuit held that law enforcement's one-minute protective sweep of the suspect's house was "not inconsistent with the Fourth Amendment" and that "based upon the information the arresting officers had at the time, it was reasonable for them to take steps to ensure their safety." 49 F.3d at 691. There officers first on the scene had reason to believe that other people were in the subject's home at the time they executed their arrest warrant. *Id*. at 690. Once the suspect was secured in the living room, the officers fanned through the house and discovered the

suspect's girlfriend in one room and his roommate in another. *Id*. at 688. Given the totality of the circumstances, the court determined that the protective sweep did not constitute an illegal search.

Here, as in *Hromada*, once the Defendant was secured in the living room, law enforcement fanned through the residence and discovered the Defendant's father and brother in one room. Law enforcement also swept through the Defendant's bathroom, as they did not know if there were additional individuals inside of the bathroom that could pose a danger to law enforcement. As law enforcement made their way into the bathroom, they observed in plain view, a firearm inside the unlidded toilet tank. Under the plain view doctrine, law enforcement may then seize evidence of a crime when the officer is lawfully located in a place from which the object can be plainly viewed, the officer has a lawful right to access the object, and the object's incriminating character is immediately apparent. *United States v. Smith,* 459 F.3d 1276, 1290 (11th Cir. 2006). Here law enforcement was lawfully located inside of the Defendant's bathroom to ensure that no else was hiding behind the curtain showers or inside the bathtub. Based on the circumstances known to law enforcement at the time they observed the Defendant's firearm in his residence, including the Defendant's flight to avoid arrest, law enforcement had probable cause to believe that the firearm constituted evidence of a crime – illegal firearm possession. Thus, law enforcement could lawfully have seized the firearm at that time. But Officers did more, consistent with proper Fourth Amendment principles,

by securing the scene and seeking a search warrant to confirm their authority to seize that evidence.

Based on the facts of this case, law enforcement conducted a valid protective sweep of the Defendant's residence, which included the bathroom and the living room. As such, the motion to suppress all evidence seized from the Defendant's residence and his statements made after arrest should be denied.[1]

### III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress Physical Evidence and Statements should be DENIED. Pursuant to S.D.Fla.Mag.J.R.4(b), the Court finds good cause to expedite any objections to this Report and Recommendation. The parties shall have until October 13, 2018 to serve and file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of any finding in this Report and Recommendation and bar the parties from attacking on appeal the findings contained therein. *See R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. 1982) (en banc); 28 U.S.C. § 636(b)(1).

---

[1] Because we find that the initial entry and resulting protective sweep was valid, we need not determine whether the independent source doctrine also applies in this case.

**DONE AND ORDERED** in Chambers at Miami, Florida this 9th day of October, 2018.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge